UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JOHN DOE, | |
| PLAINTIFF | |
| v. | Civ. No. 22-cv-1019 |
| PRAIRIE VIEW A&M UNIVERSITY, ALEXIS BOYD, LATOYA DOUGLAS, DANIEL HERNANDEZ, KEITH T. JEMISON, ANWAR PHILLIPS, and STEVEN RANSOM, | |
| DEFENDANTS. | |

**COMPLAINT AND JURY DEMAND**

I.  **INTRODUCTION**

1.      John Doe sues Defendants under 42 U.S.C. § 1983 for the violation of his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and under Title IX of the Education Amendments of 1972, 20 U.S.C. 1681, *et seq.* ("Title IX").

2.      Prairie View A&M University (PVAMU) expelled Doe after an irregular process without substantial evidence, in which the university denied Doe access to exculpatory evidence which it subsequently lost or destroyed; relied on the testimony of a confused witness who repeatedly misidentified Doe; permitted the university's investigator to cross-examine the parties and witnesses in violation of PVAMU policy and federal regulations; sanctioned Doe with expulsion despite the fact that the university's sanctioning matrix recommended probation; and forced Doe to wait more than a month for an appeal decision despite university policy requiring that appeals be decided within ten days.

3.      In doing so, PVAMU violated John Doe's constitutional rights.

1

4.      PVAMU also violated John Doe's right to an equitable grievance process under Title IX by ignoring multiple provisions of the Department of Education's Title IX regulations, 34 C.F.R. 106 *et seq*, including when it allowed the investigator to exercise undue influence over the hearing and when it failed to turn over potentially exculpatory evidence upon John Doe's request – evidence that PVAMU officials subsequently lost or destroyed.

## II.   PARTIES

5.      Until his expulsion on March 15, 2022, Plaintiff John Doe was a student at PVAMU. He is a resident of Texas.

6.      Defendant Prairie View A&M University is a public, Historically Black College/University located in Prairie View, Texas. It is a member of the Texas A&M University System.

7.      Defendant Alexis Boyd is the Director of Title IX Compliance and Title IX Coordinator at PVAMU. She was responsible for overseeing and managing the Title IX investigation and hearing process that led to John Doe's expulsion. At all times relevant to this Complaint, Defendant Boyd acted under color of state law and is sued in her individual and official capacities.

8.      Defendant LaToya Douglas is an EEO Compliance Investigator at PVAMU. She served as the investigator in John Doe's case and, contrary to Texas A&M regulations and federal law, cross-examined Doe and the other parties and witnesses at his Title IX disciplinary hearing. At all times relevant to this Complaint, Defendant Douglas acted under color of state law and is sued in her individual and official capacities.

9.      Defendant Daniel Hernandez is an Associate Professor in the School of Architecture at PVAMU. He served as the decisionmaker at John Doe's disciplinary hearing and was responsible for the conduct of the hearing, including calling parties and witnesses and

overseeing their testimony and their cross-examination. At all times relevant to this Complaint, Defendant Hernandez acted under color of state law and is sued in his individual and official capacities.

10.     Defendant Keith T. Jemison is the Chief of Police at PVAMU. He is in charge of the University Police Department (UPD). Upon information and belief, one or more UPD employees refused to provide Doe with potentially exculpatory evidence that he requested as part of the university's Title IX investigation, and then subsequently lost or destroyed that evidence. At all times relevant to this Complaint, Defendant Jemison acted under color of state law and is sued in his individual and official capacities.

11.     Defendant Anwar Phillips is a Title IX Case Analyst at PVAMU. He assisted PVAMU's Title IX Office in the handling of John Doe's case. Throughout the process, he repeatedly contacted Plaintiff about substantive matters without prior notice and without giving Doe the opportunity to have his advisor present, in violation of university and federal regulations. At all times relevant to this Complaint, Defendant Phillips acted under color of state law and is sued in his individual and official capacities.

12.     Defendant Steven Ransom is the Associate Vice President for Student Affairs at PVAMU. He served as the Appellate Authority in John Doe's case. Defendant Ransom ignored clear evidence of serious procedural errors when he denied Doe's appeal. At all times relevant to this Complaint, Defendant Ransom acted under color of state law and is sued in his individual and official capacities.

## III.   JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. § 1331 and under 28 U.S.C. § 1367(a) because Plaintiff's cause of action arises under Title IX, 20 U.S.C. 1681, *et seq* and 42 U.S.C. § 1983, laws of the United States.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside within the jurisdiction of this Court and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred at Defendants' campus in Prairie View, Texas within the jurisdiction of this Court.

## IV.   BACKGROUND FACTS

### A.  Title IX Enforcement

15.     Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

16.     Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. PVAMU is a recipient of federal funds and is therefore bound by Title IX and its regulations.

17.     Under Title IX, colleges and universities are required to maintain grievance procedures for the adjudication of complaints of student-on-student sexual harassment and violence, which – if not appropriately addressed by an educational institution – can amount to prohibited sex discrimination in violation of Title IX.

18.     For more than a decade, there has been significant public and legal pressure on universities to increase prosecutions of male students in campus Title IX cases in order to combat a perceived epidemic of campus sexual violence.

19.     Prairie View A&M University is no stranger to this pressure. In 2017, 2018, and 2019, PVAMU faced three separate lawsuits from female students alleging that the university did not do enough to address their claims of sexual harassment and assault. *See Doe v. Prairie View A&M Univ.*, No. 4:19-cv-01209 (S.D. Tex. filed Apr. 3, 2019); *Doe v. Prairie View A&M Univ.*,

No. 4:18-cv-00399 (S.D. Tex. filed Feb. 8, 2018); *Doe v. Prairie View A&M Univ.*, No. 4:17-cv-01957 (S.D. Tex. filed June 26, 2017). *See also* Brittany Britto, *Former student sues Prairie View A&M for lack of response to alleged sexual assault*, HOUSTON CHRONICLE, Apr. 26, 2019, https://www.houstonchronicle.com/news/houston-texas/education/article/Former-student-sues-Prairie-View-A-M-for-lack-of-13799116.php; Lindsay Ellis & Jenny Dial Creech, *Lawsuit: Prairie View A&M coach helped student accused of sexual assault flee Texas*, HOUSTON CHRONICLE, Feb. 12, 2018, https://www.chron.com/local/education/campus-chronicles/article/Lawsuit-Prairie-View-A-M-coach-helped-student-12606721.php.

20.     Upon information and belief, these pressures forced PVAMU to overreact to student allegations and impose harsh sanctions even where, as here, the university lost or destroyed evidence, employed hearing procedures at odds with university policy and federal regulations, relied on the testimony of a confused witness, and imposed a sanction inconsistent with its own sanctioning guidelines.

## B.  The Federal Title IX Regulations

21.     On May 19, 2020, the U.S. Department of Education enacted new regulations governing Title IX grievance procedures. These regulations were enacted, in part, to address growing concern over universities' use of biased and inadequate procedures that denied a fair process to respondents in campus sexual misconduct cases. The regulations took effect on August 14, 2020.

22.     The federal Title IX regulations require universities to provide a formal written notice of allegations that includes "the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known." 34 C.F.R. § 106.45(b)(2).

23.     The federal Title IX regulations require an "objective evaluation of all relevant evidence - including both inculpatory and exculpatory evidence," 34 C.F.R. § 106.45(b)(1)(ii).

24.     The regulations require that universities give each party in a Title IX grievance proceeding "the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice," 34 C.F.R. § 106.45(b)(5)(iv).

25.     The regulations also require a strict separation between the role of investigator and the role of adjudicator, on the grounds that "the Department [of Education] believes that formally separating the investigative and adjudicative roles in the Title IX grievance process is important to reduce the risk and perception of bias, increase the reliability of fact-finding, and promote sound bases for responsibility determinations." 85 Fed. Reg. 30368.

26.     The regulations allow for cross-examination of parties and witnesses but require that cross-examination "must be conducted…by the party's advisor of choice," 34 C.F.R. § 106.45(b)(6)(i).

**C.  PVAMU's Title IX Policies and Regulations**

27.     Prairie View A&M University is part of the Texas A&M University System.

28.     The resolution of sexual misconduct complaints at Texas A&M University institutions is governed by TAMU Regulation 08.01.01, *Civil Rights Compliance*.

29.     In addition, the resolution of sexual misconduct complaints at PVAMU is also governed by PVAMU Rule 08.01.01.P1, *Civil Rights Compliance*.

30.     PVAMU also maintains a "Title IX Cumulative Student Sanctioning Matrix" for students found responsible for sexual misconduct.

31.     Under TAMU Regulation 08.01.01, the investigator's role in the Title IX process is "limited to only reporting the evidence collected during the investigation, as well as issuing appropriate determinations surrounding credibility of witnesses and evidence." Neither TAMU

nor PVAMU policy allows the investigator to actively participate in the hearing by cross-examining parties and witnesses.

32.     Under TAMU Regulation 08.01.01, PVAMU's decision letter in a Title IX case must include "[a] description of the procedural steps taken from the receipt of a formal complaint through determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held if any."

33.     Under PVAMU Rule 08.01.01.P1, when a party in a Title IX case appeals the university's decision, "[t]he appellate authority has ten (10) business days to reach their decision."

34.     According to PVAMU's Title IX Cumulative Student Sanctioning Matrix, the baseline sanction for "sexual exploitation" — the offense for which John Doe was found responsible — is probation. That sanction can be increased to suspension if there are aggravating factors such as "possessing and/or viewing child pornography" or knowingly transmitting an STD to another person without their knowledge.  Expulsion is appropriate only if there are aggravating factors such as "collecting, creating, and/or distributing child pornography" or "prostituting another person."

**D.  John Doe and Jane Roe Had a Consensual Sexual Encounter**

35.     John Doe was, until recently, an exemplary member of the PVAMU student body. Until December 2021, when the strain of PVAMU's unfair disciplinary proceeding affected his mental health, he maintained a 3.3 GPA, and was set to graduate with a degree in Finance at the end of this year.

36.     Doe's goal is to pursue a career in investment banking, and in Summer 2021, he was the only student from a Historically Black College/University to be selected for the Middle Market Finance Internship at JP Morgan Chase.

37.     Born and raised in Michigan, John Doe was a scholar-athlete and a member of the varsity football and track teams in high school. He volunteered as a mentor to at-risk youth in the Detroit area and graduated high school ranked 35th out of 309 students in his graduating class.

38.     John Doe first met Jane Roe, a fellow PVAMU student, through a mutual friend in October 2020. They later connected on social media, and she reached out to express a sexual interest in him, but by that point Doe was elsewhere for the semester. Doe eventually reached back out to Roe in February 2021.

39.     On the night of February 2, 2021, Jane Roe came to Doe's apartment on PVAMU's campus and they had consensual sex.

40.     The following day, February 3, 2021, Doe texted Jane Roe to see if she would like to come to his apartment again that night. At the time, he was living with two roommates, "RR" and "NH."

41.     When Jane Roe arrived at John Doe's apartment on February 3, 2021, RR was in Doe's room playing video games. Jane went into Doe's room and she and RR introduced themselves. Doe joined them a few minutes later.

42.     John Doe, Jane Roe, and RR socialized in Doe's room for a while. They watched a movie and drank some tequila but not to the point of intoxication. They also engaged in conversation about assorted topics, including sexual topics such as their favorite sexual positions.

43.     Eventually, John Doe and Jane Roe began to pair off in a way that indicated to RR that they wanted to be alone together. RR left the room, and Doe and Roe had consensual sex. The room was mostly dark, but the television was still on, providing some light. They did not use a condom. After they had sex, Doe left his bedroom to get a glass of water.

44.     It is undisputed that the sex between John Doe and Jane Roe was consensual.

### E.  Jane Roe's Encounter with RR and its Aftermath

45.    John Doe left the bedroom to get water after he and Jane Roe had sex.  His third roommate — NH — had returned home and was in the common room watching television. Doe and NH engaged in conversation, and eventually RR emerged from his room and joined the conversation.

46.    John Doe told RR and NH that he and Jane Roe had had sex. RR asked Doe whether he thought she might be interested in having sex with him too, given the sexualized conversation that took place between the three of them earlier in the evening.

47.    Doe told RR that he would need to ask her, and RR then went into Doe's room. Doe remained in the common room. When RR opened Doe's bedroom door, Doe could see that the television was still on and illuminating the room.

48.    Shortly thereafter, Doe started to hear sexual moaning sounds coming from his bedroom. They sounded normal, not like anyone was in distress.

49.    Approximately 15 or 20 minutes later, RR emerged from Doe's bedroom and sat back down on the common room couch. He told Doe and NH that he and Jane Roe had sex. About 5 minutes later, RR asked Doe to go check on Jane Roe because she had not come out of the bedroom.

50.    When Doe entered his bedroom, the television was still on, and the room lights were now on as well. Jane Roe had her Airpods in and was on a FaceTime call. Doe could hear her conversing with her friends. He asked her if everything was okay, but she did not respond. She appeared to be fully immersed in her FaceTime conversation.  She did not appear distraught or upset.

51.     Several minutes later, Roe left Doe's bedroom and the apartment without saying anything. Doe was not concerned at the time, because Jane Roe had left the same way without saying anything after their previous sexual encounter the day before.

52.     Shortly after Roe left Doe's apartment, he texted her to make sure everything was okay since she had not responded when he asked her in his bedroom. She responded angrily, saying "that's foul" and "why would you even think that shit was okay bro?" She told Doe that when she was having sex with RR, "I thought it was you."

53.     Around 12:30 AM on February 4, 2021, shortly after Roe sent Doe the angry text messages, eight PVAMU students — 4 men and 4 women — entered Doe's apartment. They began trashing the apartment and threatening Doe and his roommates with a taser, which was against PVAMU rules.

54.     One woman — MD — dumped water on Doe. Soon after this disturbance started, the campus police arrived. But the police did nothing about the assault and threat with a weapon against John Doe.

55.     Doe gave them a verbal and a written statement. They took pictures and collected a bedsheet and a condom that RR had used. Doe also went to the police station and gave them another statement, leaving at around 4 AM.

56.     Later that day, February 4, 2021, RR and John Doe discussed the previous night's events. RR told Doe that when RR entered Doe's bedroom, he and Jane Roe made eye contact and she asked him if he had a condom. RR did, in fact, use a condom with Jane Roe.  This was the condom that the police collected the night before.

57.     Jane Roe and John Doe had not used condoms during their sexual encounters on February 2 and February 3, because Doe had provided Roe with STI test results.

58.     RR and John Doe discussed what they had told campus police about the incident, and it was Doe's understanding that the account that RR gave to police was consistent with Doe's understanding of events — namely, that RR had asked Doe whether Jane Roe might have sex with him too, that Doe had said RR should ask her, and that RR had sought and obtained consent from Roe.

### F.  PVAMU Pressures Jane Roe to File a Complaint, then Conducts a Biased and Irregular Investigation

59.     On February 4, 2021, PVAMU's Title IX office was notified by the PVAMU police department about the February 3 incident involving John Doe, Jane Roe, and RR.

60.     Between February 4 and March 1, 2021, PVAMU's Title IX office sent three separate outreach letters to Jane Roe inviting her to file a Title IX complaint.

61.     On March 23, 2021, the Title IX office closed the case due to a lack of participation from Jane Roe. However, on April 15, 2021, Jane Roe responded to the outreach letters and the Title IX office re-opened the case.

62.     On May 4, 2021, John Doe received a letter from Defendant Boyd notifying him of an alleged violation of Texas A&M's Civil Rights Compliance regulation and asking him to meet the following day.

63.     Contrary to Texas A&M policy and federal regulations, this notice did not identify the specific conduct that allegedly violated university policy. Instead, to obtain this required information, Doe's advisor, attorney Patrick Saccocio, had to write a letter to Defendant Alexis Boyd asking her to provide the information.

64.     Defendant Boyd subsequently provided Doe with an updated notice letter stating that Doe had allegedly committed misconduct "by leaving [Jane Roe] in a bedroom in your apartment immediately after sexual intercourse, and telling her that you would return to the

bedroom but instead visiting your roommate, [RR], and telling him that he could enter the bedroom, which led to alleged non-consensual sexual activity between [RR] and [Jane Roe]."

65.     Needless to say, there is no rule at PVAMU against leaving one's own bedroom immediately after consensual sex or against telling a sexual partner that you will return to the bedroom or against visiting one's roommate.  There is no rule against granting another person permission to enter one's own room.  Jane Roe was, of course, present in John Doe's room because he had granted her permission to be there.  And, of course, Jane Roe, RR, and John Doe had all been in his room earlier that evening, by his permission.  Thus, PVAMU did not actually allege, from the start, that John Doe had violated any rules.

66.     There is not, and has never been, any allegation that John Doe engaged in any non-consensual sexual contact with Jane Roe or anyone else.

67.     Eventually, the sole allegation was that John Doe told RR that Jane Roe was "ready" for him and that RR could enter his bedroom.

68.     At this point, John Doe believed that the written statements that his roommates had given to PVAMU police would exonerate him by making clear that he had never said to RR that he could have sex with Jane Roe without first asking for her consent.

69.     On June 11, 2021, the university's investigator, Defendant LaToya Douglas, interviewed John Doe.

70.     On August 4, 2021, Doe and Patrick Saccocio participated in a conference to try and reach an informal resolution of the case but were unable to come to an agreement.  Under the new regulations of Title IX, students may come to an agreement, through mediation or otherwise, to resolve a Title IX complaint, and this is called "informal resolution."  By contrast, "formal resolution" involves the complete investigation, hearing, and cross-examination.

71.     Following the conference, Defendant Anwar Phillips called Doe, without Doe's advisor present, to pressure him to resolve the matter by accepting responsibility for one of the charges. Defendant Phillips told Doe this would be the only way to reach an informal resolution. Doe was unwilling to accept responsibility because he had not done anything to try and help RR take sexual advantage of Jane Roe.

72.     On November 10, 2021, Defendant Boyd sent Doe a draft investigative report in his case. Doe reviewed the report. The written statements that he, RR, and NH had given to the campus police were not there. He also discovered that RR had told Defendant Douglas that Doe had come to RR's room and told RR that Jane Roe was "ready" to have sex with RR. This was not true.

73.     Because RR had characterized his statement to police in prior conversations with John Doe as consistent with John Doe's account of the events, Doe considered the written statements to police to be potentially critical exculpatory evidence. In his response to the draft investigative report, he therefore asked Defendant Douglas to please locate "these essential statements" and include them in the final investigative report.

74.     On December 10, 2021, Defendant Douglas issued her final investigative report. The statements to police that Doe had requested in his response to the draft report were still nowhere to be found.

75.     Based on Defendant Douglas's interviews with John Doe, RR, and NH, she found RR and NH more credible than John Doe regarding what Doe had said to RR about the possibility of RR having sex with Jane Roe. Yet John Doe's understanding is that the statements that RR and NH gave to the police on the night of the incident — unlike the statements they later gave to Defendant Douglas — corroborate his version of events.

13

76.     On January 2, 2022, Doe emailed the Title IX office to again request those police statements. The Title IX office responded on January 3, 2022, stating that they had requested the statements, but that PVAMU police had not provided them. They said Doe could instead question the police officer at the hearing. However, the officer who took those statements did not appear at the hearing.

### D.     PVAMU Invents its Own Rules in an Irregular and Biased Hearing

77.     John Doe's hearing took place on January 7, 2022. Although Texas A&M policy and the federal Title IX regulations require cross-examination to be conducted by the parties' advisors, Defendant Daniel Hernandez, the hearing officer, allowed Defendant Douglas, the investigator, who had an obvious interest in defending her own findings of fact and conclusions, to attend the entire hearing and cross-examine the parties after she finished testifying as a witness.

78.     One of the witnesses at the hearing was Kalon Junious, a PVAMU police officer who responded to the disturbance in John Doe's apartment described in ¶ 53, *supra*.

79.     Officer Junious testified about his perception of the relative credibility of John Doe and his roommate, RR. However, Officer Junious could not even tell which individual was John Doe and which individual was RR. While he initially testified that he felt RR was not being truthful, he later said he was actually talking about John Doe and that RR *did* seem to be truthful. Subsequently, however, he identified RR as the Respondent present at the hearing, when it was actually John Doe.

80.     Although Defendant Hernandez was, under Texas A&M policy, the sole decision-maker at the hearing, Defendant Hernandez announced at the conclusion of the hearing that "we will be closing the hearing and moving into deliberations."

14

81.     On January 19, 2022, PVAMU issued its decision in John Doe's case. He was found responsible for "sexual exploitation" and "complicity" and sanctioned with expulsion.

82.     According to PVAMU's Title IX sanctioning matrix, the standard sanction for "sexual exploitation" is probation, not expulsion, absent aggravating factors like possession of child pornography or prostituting another person.

83.     Upon information and belief, RR — who, unlike John Doe, was actually accused of having ***non-consensual*** sex with Jane Roe — accepted an informal resolution and remains enrolled at PVAMU.  In short, assuming PVAMU's conclusion that RR had non-consensual sex with Jane Roe is accurate, a rapist went free while John Doe took the fall.

84.     Under Texas A&M policy and the federal Title IX regulations, PVAMU's decision letter was supposed to include a list of all the procedural steps taken to collect information during the investigation. It did not. Instead, John Doe and his advisor had to request that information from PVAMU after the decision letter was issued.

85.      When PVAMU provided Doe and his advisor with the list of procedural steps taken, that list included information on how various types of evidence were requested and collected. It made no mention of any attempt to obtain the police statements. Upon information and belief, if the Title IX office had actually requested these statements from PVAMU police, this information would have appeared in the list of procedural steps taken.  As it turned out, however, PVAMU lost or destroyed these statements.  How they were collected, only to go missing, has never been determined.

**E.     PVAMU Belatedly Denies John Doe's Appeal, Admits Critical Evidence was Lost or Destroyed**

86.     In accordance with Texas A&M policy, John Doe filed an appeal of the university's decision within five (5) business days of the decision's issuance.

87.     Although PVAMU policy states that appeals must be decided within ten days, John Doe heard nothing from the university for more than month after filing his appeal, awaiting his fate in total silence. Only after counsel for John Doe wrote to Defendants' counsel on March 7, 2022, did PVAMU inform Doe that the appellate authority, Defendant Steven Ransom, had requested and received several "extensions" in his case – extensions for which there are no allowance in PVAMU's policy.

88.     It was not until March 15 – more than 6 weeks after John Doe submitted his appeal – that Defendant Ransom issued a decision upholding Doe's expulsion.

89.     With regard to the statements that Doe's roommates gave to police on the night of the incident, Defendant Ransom noted that these "no longer exist" and that "due to the absence of documents, it is impossible to say what the documents would have shown."  That PVAMU's own incompetence led to their destruction or disappearance was of no concern to Defendant Ransom.

90.      Following the long-delayed appeal decision, PVAMU's Title IX office immediately informed John Doe that he was expelled effective immediately.  PVAMU threatened that he would be charged with "criminal trespass" if he attempted to attend classes or any other university functions. Despite this, PVAMU did not disenroll Doe from his classes, and as a result he continues to be contacted by his professors despite his expulsion.

91.     John Doe was only one semester away from graduating. PVAMU's actions have pre-empted his search for internships and post-university employment. It makes transfer to another university impossible, and brands him a sexual predator.

92.     In addition to the emotional toll this has taken on John Doe, he will suffer the consequences of diminished income and career opportunities extending into the indefinite future.

V.    CAUSES OF ACTION

> **COUNT 1:**    **Due Process under the 5th and 14th Amendment to the United States Constitution and 42 U.S.C. § 1983 (Individual Defendants)**

93.    Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

94.    The Fourteenth Amendment to the United States Constitution provide that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case Defendants are state actors subject to the Fourteenth Amendment. The Fifth Amendment to the United States Constitution likewise provides, "No person shall … be deprived of life, liberty, or property, without due process of law."

95.    Defendants are state actors subject to the Fifth Amendment.

96.    Section 1983 of Title 42 of the U.S. Code provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

97.    Defendants are employees of PVAMU who, at all times relevant to this Complaint, were acting under color of state law.

98.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

99.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process. John Doe has a constitutionally protected property interest in his continued enrollment at PVAMU and in his right to be free from arbitrary and unfair discipline

from the policies, courses of conduct, practices and understandings established by PVAMU and the laws of Texas and the United States.

100.     It is well established that Fifth and Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings of state institutions. A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he faced. The allegations of "sexual exploitation" in this case resulted in a sanction that will have an irreparable and lifelong impact on John Doe.

101.     Defendants acted to deny John Doe's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution by, among other things, the following:

    a.  Failing to turn over potentially exculpatory evidence upon John Doe's request, and subsequently losing or destroying that evidence.

    b.  Relying on the credibility testimony of a witness who repeatedly confused John Doe with his roommate, RR, and who could, in fact, not tell either one from the other.

    c.  Permitting the investigator to exercise undue influence over the hearing.

    d.  Failing to follow multiple university regulations intended to guarantee a fair and unbiased process.

102.     John Doe has been damaged and deprived of his education and suffered harm to his reputation. He suffers diminished income and career opportunity for all future time on account of Defendants' failure to provide him with due process.

103.     Defendants, acting under color of state law, have therefore violated John Doe's constitutional rights.

104.     John Doe is entitled to damages in an amount to be determined at trial, plus pre-
and post-judgment interest, attorney fees, expenses, and costs, and to an injunction enjoining
violations of the Fifth and Fourteenth Amendments to the United States Constitution in the
investigation and adjudication of sexual misconduct complaints by Defendants.

**COUNT 2:**          **Title IX, 20 U.S.C. § 1681**
                     **(PVAMU)**

105.     Plaintiff restates, realleges, and incorporates by reference all allegations set forth
in every preceding paragraph as if set forth in this paragraph in full.

106.     Title IX of the Education Amendments of 1972 provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under
> any education program or activity receiving Federal financial assistance.

107.     PVAMU is an institution of higher education that receives federal funding.

108.     Pursuant to Title IX of the Education Amendments of 1972, PVAMU is obligated
to provide parties in Title IX sexual misconduct cases with a grievance proceeding that is prompt
and equitable. The standards for what constitutes a prompt and equitable grievance proceeding
are set forth in the Title IX regulations at 34 C.F.R. § 106.

109.     In adjudicating John Doe's case, PVAMU ignored multiple provisions of the Title
IX regulations guaranteeing a prompt and equitable process. It did so because of the pressure it
faced, following the multiple lawsuits brought by female students regarding PVAMU's response
to sexual assault, to discipline male students accused of sexual misconduct.

110.     Although the Title IX regulations require universities to provide the parties with
notice including "the identities of the parties involved in the incident, if known, the conduct
allegedly constituting sexual harassment, and the date and location of the alleged incident, if
known," 34 C.F.R. § 106.45(b)(2), PVAMU did not initially provide John Doe with this

information. Instead, PVAMU provided it only after John Doe's attorney advisor, Patrick Saccocio, contacted the university about the missing information.

111.    The Title IX regulations also require an "objective evaluation of all relevant evidence - including both inculpatory and exculpatory evidence," 34 C.F.R. § 106.45(b)(1)(ii). However, PVAMU repeatedly ignored John Doe's requests for evidence in the university's possession that Doe understood to be exculpatory. When Doe again raised concerns about this missing evidence in his internal university appeal, PVAMU admitted that the documents that were in its sole custody "no longer exist."

112.    The regulations require that universities give each party in a Title IX grievance proceeding "the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice," 34 C.F.R. § 106.45(b)(5)(iv), yet Defendant Anwar Phillips repeatedly contacted John Doe about substantive matters relating to his case without providing him the opportunity to have his advisor present.

113.    The regulations require a strict separation between the role of investigator and the role of adjudicator, and require that cross-examination "must" be conducted by the parties' advisors. Yet PVAMU allowed its investigator, Defendant LaToya Douglas, to remain in the hearing following her testimony as a witness and to cross-examine the parties and other witnesses.  She also may have gone into closed session with the hearing officer to "deliberate."

114.    Although the Title IX regulations require a university's determination of responsibility to include "A description of the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held," PVAMU did not initially provide John Doe with this information. PVAMU

provided it only after John Doe's attorney advisor, Patrick Saccocio, contacted the university about the missing information.

115.    John Doe has been irreparably harmed by his expulsion from PVAMU. He has suffered reputational harm and will suffer diminished income and career opportunities due to the gap in his educational record and the stigma of a finding of responsibility for sexual misconduct.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff prays this Court to grant the following relief:

i.    Declare Defendant Prairie View A&M University in violation of Title IX of the Education Amendments of 1972;

ii.    Declare the Individual Defendants to have violated John Doe's constitutional right to due process under 42 U.S.C. § 1983;

iii.    Order Defendant Prairie View A&M University to expunge John Doe's transcript and college record of any reference to his wrongful sanctions and finding of "responsibility" for any and all sexual misconduct;

iv.    Order Defendant Prairie View A&M University to pay all direct and indirect damages suffered by John Doe;

v.    Order Defendants to pay John Doe's reasonable attorney fees and costs under 42 U.S.C. § 1988(b) and other applicable laws; and

vi.    Order such additional legal or equitable relief as the Court finds just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Dated: March 29, 2022

/s/ Samantha K. Harris
Samantha K. Harris
ALLEN HARRIS PLLC
PO Box 673
Narberth, PA 19072
(860) 345-5310
sharris@allenharrislaw.com
PA Bar No. 90268
*Attorney in Charge*
*Pro hac vice admission pending*


/s/ Ramón A. Soto
Ramón A. Soto
HARRISON, HART & DAVIS LLC
925 Park Ave. SW, Suite E
Albuquerque, NM 87102
(505) 295-3261 ext. 104
ramon@harrisonhartlaw.com
S.D. Tex. Bar No. 24118927
Texas Bar. No. 24118927

ATTORNEYS FOR PLAINTIFF