IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE,<br>    *Plaintiff*, | §<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. 4:22-cv-01019 |
| | § | |
| PRAIRIE VIEW A&M UNIVERSITY,<br>    *Defendant*. | §<br>§<br>§ | JURY DEMAND |

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John Doe respectfully opposes Defendant Prairie View A&M University's (PVAMU's) Motion for Summary Judgment (ECF No. 42-44) and submits in support Plaintiff's Appendix in Opposition to Defendant's Motion for Summary Judgment. Disputed material facts require that PVAMU's motion be denied.

## I.  INTRODUCTION

This case involves unusual circumstances. Although PVAMU expelled Doe for sexual misconduct, it is undisputed that no non-consensual contact occurred between Doe and the female complainant in the underlying disciplinary proceeding, Jane Roe. Rather, the sole allegation against Doe is that after having consensual sex with Roe, he allowed his then-roommate, RR, to enter his bedroom, which PVAMU claims "led to" non-consensual sex between RR and Roe.

1

After an irregular process in which PVAMU's investigator improperly excluded evidence of witness bias from her investigative report and personally cross-examined witnesses at the hearing, PVAMU's decision-maker found Doe responsible based on erroneous factual findings and expelled him in defiance of the university's own "sanctioning matrix" for sexual misconduct cases. Contrary to PVAMU's assertion, there is ample evidence both that there were substantial procedural irregularities in Doe's case and that gender bias was a motivating factor in the outcome of the case.

## II.  LEGAL STANDARD

PVAMU misstates the legal standard used in the Fifth Circuit to determine whether a school discriminated based on sex in disciplining an accused student. PVAMU cites the more rigid "erroneous outcome" and "selective enforcement" framework established by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) and referenced by the Fifth Circuit in *Klocke v. University of Texas at Arlington*, 938 F.3d 204 (5th Cir. 2019). But in *Van Overdam v. Texas A&M University*, 43 F.4th 522 (5th Cir. 2022), the Fifth Circuit adopted the more flexible approach first established by the Seventh Circuit in *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019), which asks simply: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] on the basis of sex?" *Van Overdam*, 43 F.4th at 527. That is the question before the Court today, and the answer is an unequivocal "yes."

### III. FACTS

**A. Facts concerning the February 3, 2021 incident**

Although the key facts at issue in this motion concern PVAMU's disciplinary process, it is necessary to identify points of dispute concerning PVAMU's recitation of the facts of the underlying incident, since PVAMU—improperly at this stage—asks the court to draw factual inferences in its favor. As an initial matter, PVAMU claims that both Roe and RR reported "that RR and Doe had previously talked about having a threesome with Roe." Dkt. 42 at 1. This is erroneous and is contradicted by the record evidence. Appx. 104 at 45-48, 55:15-19; Appx. 3. PVAMU's own investigation revealed that the text messages in question were between RR and his *other* roommate, NH. And in those text messages, RR made no reference to a conversation with Doe *or* to a threesome, but instead expressed his own desire to have sex with Roe. Appx. 6. The investigator also confirmed at the Title IX hearing that there were no texts between RR and Doe about a threesome. Appx. 104 at 46:6-47:11.

PVAMU also presents the hearing officer's factual findings as undisputed evidence even as Doe disputes those findings. Doe did *not* go to RR's room and tell RR that Roe was "ready" for him. Dkt. 42 at 3. And Roe's friend MD, upon whom the hearing officer relied for purportedly inculpatory evidence (Dkt. 42 at 4), had expressed extreme bias both towards Doe and towards males in general—bias that PVAMU's investigator excluded from her interview summary. Appx. 95 at 47:20-56:4;

3

Appx. 8-9. Had PVAMU's investigator not excluded this evidence of bias from her investigative report, MD's account of that conversation might not have been credited.

PVAMU oddly cites as evidence of Doe's purported dishonesty his acknowledgment that his roommates' testimony at the Title IX hearing was inconsistent from his own. Dkt. 42 at 5. But Doe has maintained all along that that he believes his roommates were not truthful in the Title IX process, and repeatedly asked the Title IX office to obtain his roommates' police statements, which he believes are consistent with his own version of events. Dkt. 1 ¶ 68, 72-76; Appx. at 11-13. In fact, the Title IX office's failure to obtain those police statements is one of the many procedural errors that led Doe to file this lawsuit in the first place.

In a further effort to discredit Doe, PVAMU mischaracterizes Doe's deposition testimony about the student conduct case related to his and others' use of alcohol and marijuana on February 3, 2021. While PVAMU states that Doe "indicated he would accept responsibility for the conduct violations" and subsequently "changed his position and refused to accept responsibility" (Dkt. 42 at 6), Doe in fact testified that he was coerced into accepting responsibility by a PVAMU employee who erroneously told him that he was not entitled to a hearing on the charges. Def's Appx. 24-25, 89:5-93:16.

Finally, PVAMU's account of the night of February 3, 2021 omits facts that are critical to Doe's claims of bias. Following the sexual encounter between Roe and RR, a group of Roe's friends barged into Doe's apartment uninvited. Dkt. 44-2 at 53, 78.

4

One woman, MD, threatened Doe with a taser, dumped a pitcher of water on his head, and purposely strew trash around his apartment. *Id.* at 18, 53, 78, 83, 93. These actions undisputedly violated PVAMU's student conduct code. Appx. 21-23; Appx. 118-119 at 32:16-33:12. Yet PVAMU has been unable to produce a single witness—including the head of student conduct and her then-supervisor—who can recall MD being subject to any discipline. Appx. 119 at 33:13-34:13; Appx. 123 at 31:7-32:9.

### B. Facts concerning PVAMU's disciplinary process

#### 1) *PVAMU's investigation of Jane Roe's complaint*

PVAMU's disciplinary process was plagued by procedural errors from the start. PVAMU's investigator, LaToya Douglas, treated male and female witnesses differently in a manner evincing gender bias. While the group of students who barged into Doe's apartment following RR's sexual encounter with Roe consisted of both men and women, Douglas admits that she interviewed only the women. Appx. 94 at 37:4-19. One of those women, MD, made statements to Douglas that call her credibility into question and that reflect bias towards men in general. Specifically, MD told Douglas that she went to Doe's apartment to "hurt these men for real," and added that "you really can't put anything past **any** men nowadays." Appx 95 at 48:1-11 (emphasis added). She also admitted that she was "crazy" when it came to her close friends, including Roe. *Id.* at 47:20-25.

Douglas excluded any mention of these biased statements from the summary of her interview with MD that became part of the investigative report. And although

5

PVAMU's Civil Rights Compliance Policy provides that the parties will have the opportunity to "inspect any evidence obtained during the investigation that is directly related to the allegations raised in the formal complaint," Appx. 69 at 4.2.4.8, Douglas withheld the recordings of the witness interviews. Instead, she provided them with only her summaries. Appx. 97 at 55:18-56:4. This prevented John Doe from learning of MD's bias in time to raise it at the hearing. This concealment of this critical exculpatory evidence mattered: MD's hearing testimony was deemed credible and formed part of the factual findings the hearing officer relied on to expel Doe. Dkt. 44 at 102 ¶ 14.

While obscuring evidence of gender bias on MD's part, Douglas cited far milder statements to suggest a *male* witness might be lying. Douglas interviewed a friend of Doe's, KH, with whom Doe had spoken shortly after the incident. Because KH inquired whether participating in an interview would "help" Doe, Douglas noted in her interview summary that she had to remind KH of the importance of answering questions truthfully, clearly suggesting that his question impacted his credibility. Appx. 77. When MD announced that she was "crazy" when it came to her friends, and confessed her bias against men, however, Douglas gave no such admonition. Appx. 8-9.

And although Douglas did acknowledge that MD's friendship with Roe might have given her a motive to support Roe's story, she nonetheless deemed MD credible as an "outcry" witness—that is, someone with whom Roe spoke in the immediate

6

aftermath of the incident. Dkt. 44-2 at 96; Appx. 98 at 100:8-25. When questioned at her deposition about whether KH was also an "outcry" witness because Doe spoke with him in the immediate aftermath of the incident, Douglas admitted that he was. Appx. 99 at 101:10-11. Yet she did not utilize the *male* witness's status as an outcry witness to enhance the credibility of his testimony in the disciplinary process. To the contrary, her interview summary italicized the language he used that she found less than credible, and emphasized the fact that she reminded him about the importance of responding truthfully. Appx. 77.

PVAMU's Title IX office also failed to obtain potentially critical exculpatory evidence despite Doe's repeated requests. In the early morning of February 4, Doe and his roommates provided the PVAMU police with sworn statements regarding the previous night's events. Dkt. 1 ¶ 68, 72-76; Appx. at 12. While the sworn statements of several female witnesses were attached to the information PVAMU police sent the Title IX office, Doe and his roommates' sworn statements were not. Appx. 79-91. Based on contemporaneous conversations with his roommates, Doe believed that what they told the police that night was consistent with what Doe told both police and the Title IX investigator—namely, that Doe had never told RR that Roe was "ready" for him. Dkt. 44-2 at 38 ¶144:11-145:13; Dkt. 44-2 at 117.

PVAMU Title IX Coordinator Alexis Boyd testified at deposition that she had requested the missing statements from the PVAMU police department. Appx. 109 at 75:15-76:11. However, according to PVAMU Police Chief Keith Jemison, Boyd had

7

access to the police department's records management system and could have obtained the information without assistance simply by logging in to the system. Appx. 114 at 34:19-36:10. And while the PVAMU police department changed records management systems during Doe's case, Chief Jemison testified at deposition that all the information in the old system remained stored on PVAMU police servers. Appx. 112-113 at 16:24-17:16.

### 2) *PVAMU's refusal to investigation retaliation against John Doe*

On November 12, 2021, the same day that PVAMU sent the draft investigative report to the parties, Doe's car was vandalized. Eight days later, on November 20, 2021, MD tweeted "Imagine dating a n*gga who set women up the [sic] get raped." Appx. 14. She also retweeted a February 4 tweet that included Doe's phone number and directed users to "blow that number up since he wanna set women up to get raped." *Id.* Shortly thereafter, Doe received a threatening text from an unknown number referencing where he lived and saying "u not safe" and "u need yo ass beat." Appx. 16. In his response to the draft investigative report, Doe reported these retaliatory actions. Appx. 12-16. Yet PVAMU did nothing in response. At deposition, Title IX coordinator Boyd testified that her office never investigated these allegations, even though she had spoken with Doe about them. Appx. 109 at 73:9-75:14. This is a dramatic difference from PVAMU's robust response to the allegation that Doe had allowed his roommate to enter his bedroom.

### 3) *PVAMU's hearing and decision*

The procedural irregularities continued at the hearing, which—like the investigation—was tainted by Douglas's gender bias. Texas A&M's Civil Rights Policy provides that "in complaints involving allegations of sex-based behaviors, the investigative authority will be limited to only reporting the evidence collected during the investigation, as well as issuing appropriate determinations surrounding credibility of witnesses and evidence." Appx. 38. Similarly, federal Title IX regulations strictly prohibit any co-mingling of the roles of investigator and hearing officer. 34 C.F.R. § 106.45(b)(7)(i). Yet PVAMU hearing officer Daniel Hernandez allowed Douglas, the investigative authority, to cross-examine the parties at the hearing—something that clearly exceeds the written scope of the investigator's role under Texas A&M System policy. Hernandez acknowledged as much at deposition. When asked whether "the investigator is limited to reporting the evidence collected and issuing credibility determinations," Hernandez answered "yes." Appx. 103 at 31:3-6. And when asked whether "Ms. Douglas did more than that in [John Doe's] case," Hernandez responded: "She asked questions to the parties, yes." Appx. 103 at 31:3-10. Given Douglas's clear bias, her improperly asking questions of witnesses at the hearing, aimed at supporting her own preconceived notions, further compromised the integrity of the process.

Following the hearing, Hernandez issued a decision that featured demonstrably erroneous factual findings. First, Hernandez erroneously found that Doe's roommate,

9

RR, had told university police that he and Doe had communicated by text about having a threesome with Roe. Dkt. 44-2 at 105 ¶1. In fact, the text messages in question were between RR and Doe's other roommate, NH, and did not refer to any conversation between RR and Doe. Appx. 6. Rather, they simply expressed RR's own interest in having sex with Roe. *Id.* These text messages were part of the investigative record, and Douglas also testified at the Title IX hearing that there were no texts between RR and Doe about a threesome. Appx. 104 at 46:6-14. Hernandez acknowledged this error at his deposition. Appx. 104 at 46:22-47:11.

Hernandez also relied on a factual finding that Roe "laid naked" in Doe's room expecting Doe to return when RR entered Doe's bedroom. Dkt. 44-2 at 106 ¶10. But *Roe was not naked*: by her own admission, she was wearing both a shirt and a bra when RR entered the room. Dkt. 44-2 at 94. When questioned about this factual mistake at deposition, Hernandez attempted to re-define "naked" rather than acknowledge his error:

> Q. So it's your testimony that although she was wearing a shirt and a sports bra she was naked?
> A. Yes.
>
> Appx. 106 at 56:6-8.

Hernandez found Doe responsible for "sexual exploitation" and for "complicity." Both of these findings were based on the fact that, according to Hernandez, Doe had left Roe "in a bedroom in your apartment immediately after

10

intercourse, and telling her that you would return to the bedroom but instead visiting your roommate, [RR] and telling him that he could enter the bedroom, which led to alleged non-consensual sexual activity between [RR] and [Roe]." Dkt. 44-2 at 104. There is nothing in PVAMU's conduct code that prohibits a student from allowing another student into his bedroom.

According to PVAMU's "sanctioning matrix" for Title IX cases, the standard sanction for "sexual exploitation" is probation, not expulsion. Dkt. 44-2 at 68. Expulsion is reserved for cases of sexual exploitation involving aggravating factors like child pornography or prostitution of another person. *Id.* Yet Hernandez expelled Doe for (the non-existent offense of) allowing RR to enter his bedroom.

*4) John Doe's appeal*

On appeal, PVAMU failed to correct or even meaningfully address the numerous procedural errors Doe had identified. The procedural irregularities on appeal began with the selection of Steven Ransom as the appellate authority. According to Texas A&M policy, the appellate authority must be someone who "had no previous involvement and/or participation in the investigation and/or decision." Appx. 60. Yet Ransom *had* previous involvement in Doe's case: he was involved in the adjudication of the alcohol, drug, and COVID-19 allegations that stemmed from the same set of events on February 3, 2021. Appx. 117 at 13:7-10.

On appeal, Doe raised the issue of the missing police statements—statements he believed contained critical exculpatory information. Dkt. 44-2 at 112. Appellate

11

officer Ransom responded, "According to the response received [from the Title IX office], the documents no longer exist. Due to the absence of documents, it is impossible to say what the documents would have shown." Dkt. 44-2 at 123. Ransom's conclusion relied exclusively on the representations of the Title IX office— the very office that Doe was claiming mishandled his case.

Doe's appeal also identified the investigator's procedurally improper cross-examination of the parties and witnesses at the hearing. Dkt. 44-2 at 113. Ransom concluded that "there is nothing in the process that forecloses the investigator to participate as she did." Dkt. 44-2 at 123. But Ransom was wrong: binding Texas A&M System policy explicitly states that the investigator is "limited to only reporting the evidence collected during the investigation," and issuing "determinations surrounding credibility of witnesses and evidence." Appx. 38. At deposition, Ransom reluctantly acknowledged that he had been incorrect:

> Q. Okay. So by its plain language, this policy does foreclose the investigator from doing anything other than reporting the evidence collected and issuing credibility determinations, correct?
>
> A. That's what this information implies.
>
> (Appx. 120 at 51:21-25).

Yet another procedural error Doe cited on appeal was the fact that the decision-maker, Daniel Hernandez, relied on multiple erroneous factual findings in deciding that Doe was responsible and expelling him. Dkt. 44-2 at 117-119. This included the erroneous finding that Jane Roe was naked when RR entered the room

as well as the erroneous finding that John Doe and RR had corresponded about a possible threesome. *Id.* at 117. In his appeal decision, Ransom did not even address these erroneous factual findings. Dkt. 44-2 at 122-124.

Finally, the appeal decision came after more than a month of unexplained delay that only added to Doe's anxiety. PVAMU policy states that appeals must be decided within ten days. Appx. 60. Yet Doe heard nothing from the university for more than month after filing his appeal, awaiting his fate in total silence.

## IV. ARGUMENT

### A. Summary judgment standard

At summary judgment all "evidence of the non-movant [Doe] is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A district court may not make credibility determinations or weigh evidence when deciding a summary judgment motion." *Petri v. Kestrel Oil & Gas Props., L.P.*, 878 F. Supp. 2d 744, 750 (S.D. Tex. 2012). Summary judgment may enter only if PVAMU can "show[] . . . no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A dispute of fact is "material" where its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson*, 477 U.S. at 248. And "genuine" means that "the evidence is such that a reasonable jury could return a verdict for" Doe. *Id.*

## B. Doe has presented evidence of gender discrimination in his disciplinary proceeding

*1) Legal standard*

The Fifth Circuit no longer follows the strict doctrinal framework set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994). Rather, the court applies the standard it adopted in *Van Overdam v. Texas A&M University*, 43 F.4th 522, 527 (5th Cir. 2022): "Do the alleged facts, if true, raise a plausible inference that [the university] or its administrators discriminated against [the plaintiff] on the basis of sex?" Under this framework, "[T]he operative question for summary judgment [is whether] a reasonable jury—presented with the facts alleged—[could] find that sex was a motivating factor in the University's disciplinary decision." *Doe v. Rice Univ.*, 67 F.4th 702, 709 (5th Cir. 2023) (quoting *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021)).

*2) Doe has presented evidence that casts doubt on the outcome of the disciplinary proceeding*

Although the Court is no longer limited to *Yusuf*'s doctrinal tests, these tests can still be useful because "each demonstrates that a reasonable jury—presented with the evidence in this record—could conclude that sex was a motivating factor in [a university's] decision to discipline [a respondent]." *Doe v. Rice Univ.*, 67 F.4th at 709. Under one of those tests, for "erroneous outcome," a plaintiff "must point to particular facts sufficient to cast some articulable doubt on the accuracy of the

14

outcome of the disciplinary proceeding, and demonstrate a causal connection between the flawed outcome and gender bias." *Id.* (internal citations omitted).

Doe has presented evidence of numerous, highly significant, procedural errors that cast doubt on the outcome of the disciplinary proceeding. PVAMU, by contrast, maintains that "[c]ourts have refused to infer sex discrimination from procedural irregularities." Dkt. 42 at 11. But the Fifth Circuit did just that, in *Rice*: "[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding." *Doe v. Rice Univ.*, 67 F.4th at 709 (quoting *Regents of Univ. of Cal.*, 23 F.4th at 941). PVAMU's brief does not explain why the holding in *Rice Univ.* does not bind this Court.

This case features a far more troubling array of procedural errors than the Fifth Circuit encountered in *Rice*. It began with an investigator who withheld evidence of a key witness's gender bias; focused on interviewing female witnesses supportive of Roe while declining to reach out to male witnesses; hid evidence undermining the credibility of a female witness while proactively undermining the credibility of a male witness; and improperly questioned witnesses during the hearing. It included a Title IX office that failed to obtain exculpatory evidence simply by logging into the university police department's records management system. Its hearing officer produced a findings letter riddled with demonstrably erroneous factual findings as he imposed a punishment deviating from the university's own sanctioning matrix. And it concluded with an appeals officer who inexplicably delayed his ruling despite

15

university guidelines, failed to meaningfully engage with procedural irregularities on appeal, and admitted that he misstated PVAMU's actual policy regarding the investigator's actions at the hearing.

Other courts have joined the Fifth Circuit in recognizing that an accumulation of procedural irregularities suffices to support a Title IX claim on summary judgment, particularly when combined with some evidence of gender bias by university officials. *See, e.g.*, *Doe v. Texas Christian Univ.*, 2022 U.S. Dist. LEXIS 224140, *5 (N.D. Tex. Dec. 13, 2022) ("exclusion of exculpatory evidence in violation of Title IX regulations and TCU's own policies"). *See also Doe v. Univ. of Denver*, 1 F.4th 822, 833-34 (10th Cir. 2021) (investigator omitted complainant's motives to lie from final report and failed to gather exculpatory information); *Doe v. Wash. & Lee Univ.*, 2021 U.S. Dist. LEXIS 74222, *43-44 (W.D. Va. Apr. 17, 2021) ("The existence of substantial and particularized 'procedural flaws' in Doe's proceeding 'affecting the proof' only further demonstrates that there is a genuine dispute of material fact whether W&L discriminated against Doe on the basis of sex"); *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 933 (S.D. Iowa 2021) ("Evidence of procedural deficiencies buttresses the conclusion that a reasonable jury could find sex affected Moe's Title IX proceedings," including "evidence demonstrating Grinnell College's Title IX investigation did not conform to the Policy").

PVAMU also expresses hope that because this Court did not find that the procedural irregularities in this case rose to the level of a constitutional due process

violation, those irregularities also cannot support an erroneous outcome claim. Dkt. 42 at 10. PVAMU cites no case law for this proposition, which in any event *Rice* forecloses: as the *Rice* dissent conceded, the majority reached its decision not because the accused student contended that "he did not receive due process," but rather because it accepted the viability of his argument that "the process he received was biased because of his gender in violation of Title IX." *Doe v. Rice Univ.*, 67 F.4th at 725. This Court, moreover, already recognized these two different legal standards are not coterminous, when it held that Doe had sufficiently alleged a Title IX claim despite dismissing his due process claims. Dkt. 24 at 19-20. Nor was this Court's decision in any way unusual. *See, e.g.*, *Unknown Party v. Ariz. Bd. of Regents*, 624 F. Supp. 3d 1079, 1083 (D. Ariz. Aug. 30, 2022) (citing, in part, procedural irregularities to deny university motions for summary judgment on Title IX count despite having dismissed the accused student's due process claim).

Citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), PVAMU then argues that it is irrelevant that the investigator and hearing officer may have violated the Title IX regulations during Doe's disciplinary process. However, while a violation of the regulations may not alone and automatically constitute discrimination, courts in this circuit have held that a procedural error which violates the regulations is especially suggestive of gender bias. In *Doe v. Texas Christian University*, 601 F. Supp. 3d 78, 88 (N.D. Tex. 2022), the district court held that when it comes to evidence of an erroneous outcome based on gender bias, "Procedural irregularities are particularly

relevant when they consistently favor the complainant. **So too are procedural irregularities that violate Title IX regulations, which are 'intended to effectuate Title IX's prohibition against sex discrimination**.'" (Emphasis added).

> 3) *Doe has presented evidence of a causal connection between the flawed outcome and gender bias*

Doe has presented evidence that PVAMU's investigator treated male and female witnesses differently in a manner that reflects a bias against men. Of the eight students who entered Doe's apartment following the incident on February 3, 2021, Douglas admits she chose to interview only the female students. Appx. 94 at 37:12-19. One of those women, MD, was a critical witness at the hearing whose testimony about an alleged conversation she overheard between Doe and Roe contributed to the hearing officer's finding of responsibility—even as the investigator downplayed a similarly-situated male "outcry" witness who supported Doe. Appx. 77. *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (decisionmaker trusting female witnesses over male witnesses with similar characteristics supports inference of sex discrimination). At her interview with Douglas, MD made multiple statements expressing biased attitudes towards men in general and expressing her desire to hurt Doe. Douglas excluded these statements from the interview summaries she provided to the parties and to the hearing officer. *Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 897 (N.D. Iowa July 20, 2022) (on summary judgment, fact that "certain exculpatory evidence was not considered during the investigation, nor included in materials for the [disciplinary

18

panel's] review" was among the "clear procedural irregularities from which a reasonable jury could infer gender bias"). Further, in violation of PVAMU policy and the Title IX regulations, Douglas withheld the interview recordings or transcripts themselves from the parties, ensuring that Doe and his advisor would be unaware of the bias. *Doe v. Tex. Christian Univ.*, at 88 (deviation from Title IX regulations supports inference of sex discrimination).

While Douglas hid evidence of MD's bias from the parties and the hearing officer, she openly questioned the credibility of a male witness who merely inquired whether speaking with the investigator would help Doe. In other words, when female witnesses made statements that raised concerns about their credibility, Douglas hid them, but when male witnesses did, she elevated them. *Doe v. Wash. & Lee Univ.*, 2021 U.S. Dist. LEXIS 74222, *41 (W.D. Va. April 17, 2021) ("starkly different treatment" of key testimony from male and female witness supports inference of sex discrimination on summary judgment).

Doe has further presented evidence that PVAMU treated him differently from female student MD, who threatened Doe with a taser, trashed his apartment, and disseminated his phone number on social media with instructions to "blow that number up since he wanna set women up to get raped." *Doe v. Univ. of the Scis.*, 961 F.3d 203, 211 (3d Cir. 2020) (university's failure to investigate female witness "despite having notice" she possibly violated disciplinary policy for conduct arising from the case supports inference of sex discrimination). Doe was first charged with alcohol,

19

drug, and Covid policy violations, and when he was found not responsible for those, he was charged with sexual misconduct and expelled for having allowed his roommate to enter his bedroom. MD, on the other hand, appears to have faced no discipline for her repeated and intentional misconduct.

## V. CONCLUSION

In consideration of the foregoing, this Court should deny PVAMU's Motion for Summary Judgment.

Respectfully Submitted,

ALLEN HARRIS PLLC

*/s/ Samantha K. Harris*
Samantha K. Harris
PA Bar No. 90268
PO Box 673
Narberth, PA 19072
(610) 634-8258
sharris@allenharrislaw.com

THE SOTO LAW OFFICE, LLC

*/s/ Ramón A. Soto*
PO Box 3585
Albuquerque, NM 87190
(505) 273-4062
ramon@sotolawoffice.co
S.D. Tex. Bar No. 24118927

**ATTORNEYS FOR PLAINTIFF**