IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHN DOE, | |
| PLAINTIFF | |
| v. | Civ. No. 4:22-cv-01019 |
| PRAIRIE VIEW A&M UNIVERSITY, | |
| DEFENDANT. | |

## PLAINTIFF'S PRETRIAL MEMORANDUM OF LAW

**I. INTRODUCTION**

Plaintiff John Doe filed this case against Prairie View A&M University (PVAMU) alleging constitutional due process violations and discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* following his wrongful expulsion from PVAMU in March 2022. (Doc. 1). This Court granted PVAMU's motion to dismiss the constitutional due process claim on October 24, 2022 (Doc. 24) and denied PVAMU's motion for summary judgment on the Title IX claim on August 24, 2023 (Doc. 51).

This Pretrial Memorandum of Law sets forth the factual background of the case, various substantive legal issues relating to the causes of action, and the relevant law applicable to the legal issues that may arise during trial.

1

## II.   STATEMENT OF THE CASE

The evidence shows that, in the disciplinary proceeding that led to John Doe's expulsion, the university discriminated against Plaintiff based on his sex. The Fifth Circuit evaluates claims of sex discrimination in campus disciplinary proceedings using a standard that asks: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] on the basis of sex?" *Van Overdam v. Texas A&M Univ.*, 43 F.4th 522, 527 (5th Cir. 2022). In the context of a campus disciplinary proceeding, the Fifth Circuit has held that a plaintiff can show discrimination if "a reasonable jury—presented with the facts alleged—[could] find that sex was a motivating factor in the University's disciplinary decision." *Doe v. Rice Univ.*, 67 F.4th 702, 709 (5th Cir. 2023).

One of the ways a Plaintiff can meet this standard is by "point[ing] to particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and demonstrat[ing] a causal connection between the flawed outcome and gender bias." *Doe v. Rice Univ.,* 67 F.4th at 709. Plaintiff asserts that he is able to prove his sex discrimination claim due to evidence (1) that PVAMU's investigator treated male and female witnesses differently in a manner that reflected a bias against men, and deliberately hid evidence of female witness bias from the parties and the hearing officer; and (2) that there were

numerous, highly significant, procedural errors sufficient to cast doubt on the outcome of the disciplinary proceeding.

## III. FACTUAL BACKGROUND

### A. The underlying incident

While the facts at issue in this case relate to Plaintiff's disciplinary proceeding, it is necessary to give a brief summary of the incident which gave rise to that proceeding. On the night of February 3, 2021, Plaintiff, his roommate RR, and a female PVAMU student, Jane Roe, socialized in Plaintiff's bedroom. During this time, the three students conversed about numerous topics, some of which were sexual in nature. RR eventually left the bedroom and Plaintiff and the female student, Jane Roe, had consensual sex. After this consensual sex, John Doe then left the bedroom to get water and while out of the bedroom, he had a conversation with RR about the possibility of RR and Jane Roe having sex. John Doe maintains that RR asked whether he could also have sex with Jane Roe and that Doe said RR would have to talk to Jane Roe about it; the University eventually found that John Doe told RR "he could enter the bedroom" and said words to the effect of "she's ready for you."[1]

For her part, Jane Roe alleged that shortly after she and Plaintiff had consensual sex, RR entered Plaintiff's bedroom, put on a condom (which John Doe

---

[1] Doc. 44-2 at 104.

had not), and then had sex with Roe that she claims was not consensual. Specifically, Roe claims that she believed she was having sex with Plaintiff for a second time, and that despite asking RR about a condom and engaging in dirty talk with him, she did not realize until the end of the encounter that she was actually having sex with RR. Following the end of Jane Roe's sexual encounter with RR, a group of Roe's friends barged into Plaintiff's apartment uninvited. One woman, MD, threatened Plaintiff with a taser, dumped a pitcher of water on his head, and purposely strew trash around his apartment.

   Importantly, Jane Roe never accused Plaintiff of any nonconsensual sex. Rather, he was accused of somehow facilitating RR's alleged assault by allowing RR into his bedroom while Jane Roe was inside. RR accepted an "informal resolution" in his case and remained enrolled at PVAMU. Plaintiff opted not to accept an informal resolution. Doing so, he was told, would require him to accept responsibility for facilitating the alleged rape. Unwilling to accept responsibility for something he did not do, Plaintiff chose to go through the formal hearing process, at the end of which he was expelled just one semester before his graduation.

## B. The disciplinary proceeding

### 1) Bias in the investigation

PVAMU's disciplinary process was plagued by procedural errors from the start. PVAMU's investigator, Latoya Douglas, treated male and female witnesses differently in a manner evincing gender bias. While the group of students who barged into Plaintiff's apartment following RR's sexual encounter with Jane Roe consisted of both males and females, Douglas admitted that she interviewed only the female witnesses.[2] One of those students, MD, made statements to Douglas that call her credibility into question and that reflect bias towards male students in general. Specifically, MD told Douglas that she went to Plaintiff's apartment to "hurt these men for real," and added that "you really can't put anything past any men nowadays."[3] She also admitted that she was "crazy" when it came to her close friends, including Roe.[4]

Douglas omitted any mention of these biased statements from the summary of her interview with MD and from the investigative report.[5] And although PVAMU's Civil Rights Compliance Policy—as required by the federal Title IX regulations—provides parties with the right to "inspect any evidence obtained during the investigation that is directly related to the allegations raised in the

---

[2] Douglas Depo. at 37:4-19, Doc. 49, Exhibit I.
[3] Douglas Depo. at 48:1-11, Doc. 49, Exhibit I.
[4] Douglas Depo. at 47:20-25, Doc. 49, Exhibit I.
[5] Summary of MD Interview, Doc. 49, Exhibit C.

formal complaint,"[6] Douglas withheld the recordings of the witness interviews. Instead, she provided only her summaries.[7] This prevented Plaintiff from learning of MD's bias in time to raise it at the hearing. Douglas's decision to conceal this critical exculpatory evidence mattered: MD's hearing testimony was deemed credible and formed part of the factual findings the hearing officer relied on to expel Plaintiff.[8]

While obscuring evidence suggesting gender bias on MD's part, Douglas invoked far milder statements to suggest a male witness might be lying. Douglas interviewed a friend of Plaintiff's, KH, with whom Plaintiff had spoken shortly after the incident. Because KH inquired whether participating in an interview would "help" Plaintiff, Douglas noted in her interview summary—which was included in the investigative report—that she had to remind KH of the importance of answering questions truthfully, clearly suggesting that his question impacted his credibility.[9] Yet when MD announced that she was "crazy" when it came to her friends, and confessed her bias against men, however, Douglas gave no such admonition.[10] Douglas highlighted a question from a male student about whether his statement would "help" John Doe in order to cast doubt on his credibility, but

---

[6] PVAMU Civil Rights Compliance Policy, Doc. 49, Exhibit F.
[7] Douglas Depo. at 55:18-56:4, Doc. 49, Exhibit I.
[8] Doc. 44 at 102 ¶ 14.
[9] Summary of KH Interview, Doc. 49, Exhibit G.
[10] Summary of MD Interview, Doc. 49, Exhibit C.

did not even mention overt statements that MD intended to support Jane Roe and was more or less out to get the men. She was never reminded of the importance of answering truthfully.

And although Douglas did acknowledge that MD's friendship with Roe might have given her a motive to support Roe's story, she nonetheless deemed MD credible as an "outcry" witness—that is, someone with whom Roe spoke in the immediate aftermath of the incident.[11]

Here again, the difference between Douglas' treatment of male witnesses with female ones came to the fore. When questioned at her deposition about whether KH was also an "outcry" witness because Plaintiff spoke with him in the immediate aftermath of the incident, Douglas admitted that he was.[12] Yet in her investigative report, she did not utilize the male witness's status as an outcry witness to emphasize his credibility in the disciplinary process. To the contrary, her interview summary italicized the language he used that she found less than credible, and emphasized the fact that she reminded him about the importance of responding truthfully.[13]

PVAMU's Title IX office also failed to obtain potentially critical exculpatory evidence despite Plaintiff's repeated requests. In the early morning of

---

[11] Doc. 44-2 at 96; Douglas Depo. at 100:8-25, Doc. 49, Exhibit C.
[12] Douglas Depo. at 101:10-11, Doc. 49, Exhibit C.
[13] Summary of KH Interview, Doc. 49, Exhibit G.

February 4, Plaintiff and his roommates provided the PVAMU police with sworn statements regarding the previous night's events.[14] So too did several female witnesses, including MD.[15]

While the sworn statements of several female witnesses were attached to the information PVAMU police sent the Title IX office, Plaintiff and his roommates' sworn statements were not.[16] Based on contemporaneous conversations with his roommates, Plaintiff believed that what they told the police that night was consistent with what Plaintiff told both police and the Title IX investigator—namely, that Plaintiff had never told RR that Roe was "ready" for him.[17]

PVAMU Title IX Coordinator Alexis Boyd testified at deposition that she had requested the missing statements from the PVAMU police department.[18] However, according to PVAMU Police Chief Keith Jemison, Boyd had access to the police department's records management system and could have obtained the information without assistance simply by logging in to the system.[19] And while the PVAMU police department changed records management systems during Doe's case, Chief Jemison testified at deposition that all the information in the old system

---

[14] Doc. 1 at ¶¶ 68, 72-76; Plaintiff's Response to Draft Investigative report, Doc. 49, Exhibit D.
[15] PVAMU Police Supplemental Case Report, Doc. 49, Exhibit H.
[16] PVAMU Police Supplemental Case Report, Doc. 49, Exhibit H.
[17] Doc. 44-2 at 38 ¶144:11-145:13; Doc. 44-2 at 117.
[18] Boyd Depo. at 75:15-76:11, Doc. 49, Exhibit K.
[19] Jemison Depo. at 34:19-36:10, Doc. 49, Exhibit L.

remained stored on PVAMU police servers.[20] Yet the story from PVAMU is that these male students' statements "no longer exist[ed]."[21] Somehow the female students' statements to the police were available, but the male students' statements were lost.

### 2) *PVAMU's refusal to investigation retaliation against Plaintiff*

On the same day that PVAMU sent the draft investigative report to the parties, Plaintiff's car was vandalized.[22] Shortly thereafter, on November 20, 2021, MD tweeted "Imagine dating a n*gga who set women up the [sic] get raped."[23] She also retweeted a February 4 tweet that included Plaintiff's phone number and directed users to "blow that number up since he wanna set women up to get raped."[24] Shortly thereafter, Plaintiff received a threatening text from an unknown number referencing where he lived and saying "u not safe" and "u need yo ass beat."[25] This constituted retaliation under PVAMU's policies, which protect not only the complainant or witnesses but also any participant, including John Doe as respondent, from retaliation.

---

[20] Jemison Depo. at 16:24-17:16, Doc. 49, Exhibit L.
[21] Doc. 44-2 at 112.
[22] Plaintiff's Response to Draft Investigative Report, Doc. 49, Exhibit D.
[23] Plaintiff's Response to Draft Investigative Report, Doc. 49, Exhibit D.
[24] *Id.*
[25] *Id.*

Plaintiff reported this retaliation.[26] Yet PVAMU did nothing. At deposition, Title IX coordinator Boyd testified that her office never investigated these allegations, even though she admitted to receiving Plaintiff's report about them.[27] This is a dramatic difference from PVAMU's robust response to the allegation that Plaintiff had allowed his roommate to enter his bedroom.

    *3) PVAMU's hearing and decision*

The procedural irregularities continued at the hearing. The hearing—like the investigation—was tainted by Douglas's gender bias. Texas A&M's Civil Rights Policy provides that "in complaints involving allegations of sex-based behaviors, the investigative authority will be limited to only reporting the evidence collected during the investigation, as well as issuing appropriate determinations surrounding credibility of witnesses and evidence."[28] Similarly, federal Title IX regulations strictly prohibit any co-mingling of the roles of investigator and hearing officer. 34 C.F.R. § 106.45(b)(7)(i).

Yet PVAMU hearing officer Daniel Hernandez allowed Douglas, the investigative authority, to cross-examine the parties at the hearing—something that clearly exceeds the written scope of the investigator's role under Texas A&M System policy as well as under the federal Title IX regulations. Hernandez

---

[26] *Id.*
[27] Boyd Depo. at 73:9-75:14, Doc. 49, Exhibit K.
[28] Texas A&M Civil Rights Compliance Regulation, Doc. 49, Exhibit F.

acknowledged as much at deposition. When asked whether "the investigator is limited to reporting the evidence collected and issuing credibility determinations," Hernandez answered "yes."[29] And when asked whether "Ms. Douglas did more than that in [Plaintiff's] case," Hernandez responded: "She asked questions to the parties, yes."[30] Given the clear bias Douglas during her investigation, her improperly asking questions of witnesses at the hearing, aimed at supporting her own preconceived notions, further compromised the integrity of the process.

Following the hearing, Hernandez issued a decision that featured demonstrably erroneous factual findings. First, Hernandez erroneously held that Plaintiff's roommate, RR, had told university police that he and Plaintiff had communicated by text about having a threesome with Roe.[31] However, the text messages in question were actually between RR and Plaintiff's other roommate, NH, and did not refer to any conversation between RR and Plaintiff.[32] Rather, they simply expressed RR's own interest in having sex with Roe. These text messages were part of the investigative record, and Douglas also testified at the Title IX hearing that there were *no texts* between RR and Plaintiff about a threesome.[33] Hernandez acknowledged this error at his deposition.[34]

---

[29] Hernandez Depo. at 31:3-6, Doc. 49, Exhibit J.
[30] *Id.* at 31:3-10, Doc. 49, Exhibit J.
[31] Doc. 44-2 at 105 ¶1.
[32] Text messages between RR and NH, Doc. 49, Exhibit B.
[33] Hernandez Depo. at 46:22-47:11, Doc. 49, Exhibit J.
[34] *Id.*

Hernandez also relied on a factual finding that Roe "laid naked" in Plaintiff's room expecting Plaintiff to return when RR entered Plaintiff's bedroom.[35] But Roe was not naked. By her own admission, she was wearing both a shirt and a bra when RR entered the room.[36] When questioned about this factual mistake at deposition, Hernandez attempted to re-define "naked" rather than acknowledge his error:

> Q. So it's your testimony that although she was wearing a shirt and a sports bra she was naked?
>
> A. Yes.[37]

This was no trivial mischaracterization: it portrayed the alleged victim as helpless and vulnerable.

Hernandez's decision found Plaintiff responsible for "sexual exploitation" and for "complicity." Both of these findings were based on the fact that, according to Hernandez, Plaintiff had left Roe "in a bedroom in your apartment immediately after intercourse, and telling her that you would return to the bedroom but instead visiting your roommate, [RR] and telling him that he could enter the bedroom, which led to alleged non-consensual sexual activity between [RR] and [Roe]."[38]

---

[35] Doc. 44-2 at 106 ¶10.
[36] Doc. 44-2 at 94.
[37] Hernandez Depo. at 56:6-8, Doc. 49,
[38] Doc. 44-2 at 104.

There is nothing in PVAMU's conduct code that prohibits a student from allowing another student into his bedroom.

According to PVAMU's "sanctioning matrix" for Title IX cases, the standard sanction for "sexual exploitation" is probation, not expulsion.[39] Expulsion is reserved for cases of sexual exploitation involving aggravating factors like child pornography or prostitution of another person. Yet Hernandez expelled Plaintiff for (the non-existent offense of) allowing RR to enter his bedroom.

*4)  John Doe's appeal*

On appeal, PVAMU failed to correct or even meaningfully address the numerous procedural errors Plaintiff had identified. The procedural irregularities on appeal began with the selection of Steven Ransom as the appellate authority.

According to Texas A&M policy, the appellate authority must be someone who "had no previous involvement and/or participation in the investigation and/or decision."[40] Yet Ransom had previous involvement in the adjudication of Plaintiff's alleged misbehavior on the evening of February 3-February 4, 2021—namely, in the adjudication of the alcohol, drug, and COVID-19 allegations that stemmed from the same set of events on February 3, 2021.[41]

---

[39] *Id.* at 68.
[40] Texas A&M Civil Rights Compliance Regulation, Doc. 49, Exhibit F.
[41] Ransom Depo. at 13:7-10, Doc. 49, Exhibit M.

On appeal, Plaintiff raised the issue of the missing police statements of male students—statements he believed contained critical exculpatory information.[42] Appellate officer Ransom responded, "According to the response received [from the Title IX office], the documents no longer exist. Due to the absence of documents, it is impossible to say what the documents would have shown."[43]

Ransom's conclusion relied exclusively on the representations of the Title IX office—the very office that Plaintiff was claiming mishandled his case. Plaintiff's appeal also identified the investigator's procedurally improper cross-examination of the parties and witnesses at the hearing.[44] Ransom concluded that "there is nothing in the process that forecloses the investigator to participate as she did."[45] But Ransom was wrong: binding Texas A&M System policy explicitly states that the investigator is "limited to only reporting the evidence collected during the investigation," and issuing "determinations surrounding credibility of witnesses and evidence."[46]  At deposition, Ransom reluctantly acknowledged that he had been incorrect:

---

[42] Doc. 44-2 at 112.
[43] *Id.* at 123.
[44] *Id.* at 113.
[45] *Id.* at 123.
[46] Texas A&M Civil Rights Compliance Regulation, Doc. 49, Exhibit F.

> Q. Okay. So by its plain language, this policy does foreclose the investigator from doing anything other than reporting the evidence collected and issuing credibility determinations, correct?
>
> A. That's what this information implies.[47]

Yet another procedural error Plaintiff cited on appeal was the fact that the decision-maker, Daniel Hernandez, relied on multiple, clearly erroneous factual findings to find Plaintiff responsible and expel him.[48] This included the erroneous finding that Jane Roe was naked when RR entered the room as well as the erroneous finding that Plaintiff and RR had corresponded about a possible threesome.[49] In his appeal decision, Ransom did not even address these erroneous factual findings.[50]

Finally, the appeal decision was only issued after additional procedural error. Ransom issued his appeal decision after more than a month of unexplained delay that only added to Plaintiff's anxiety. PVAMU policy states that appeals must be decided within ten days.[51] Yet Plaintiff heard nothing from the university for more than month after filing his appeal, awaiting his fate in total silence.

---

[47] Ransom Depo. at 51:21-25, Doc. 49, Exhibit M.
[48] Doc. 44-2 at 117-119.
[49] *Id.*
[50] *Id.* at 122-124.
[51] PVAMU Civil Rights Compliance Policy, Doc. 49, Exhibit F.

## IV. LEGAL ISSUES AND APPLICABLE LEGAL STANDARDS

In evaluating wrongful-discipline Title IX claims, the Fifth Circuit applies the standard it adopted in *Van Overdam v. Texas A&M University*, 43 F.4th 522, 527 (5th Cir. 2022): "Do the alleged facts, if true, raise a plausible inference that [the university] or its administrators discriminated against [the plaintiff] on the basis of sex?" Under this standard, the Fifth Circuit has held that a plaintiff can show discrimination if "a reasonable jury—presented with the facts alleged—[could] find that sex was a motivating factor in the University's disciplinary decision." *Doe v. Rice Univ.*, 67 F.4th 702, 709 (5th Cir. 2023).

In evaluating this question, the Fifth Circuit has held that "[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding." *Doe v. Rice Univ.*, 67 F.4th 702, 709 (5th Cir. 2023) (quoting *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022)). This is particularly true where the procedural irregularities are combined with evidence of gender bias by university officials. *See Doe v. Texas Christian Univ.*, 2022 U.S. Dist. LEXIS 224140, *6 (N.D. Tex. Dec. 13, 2022) ("the Court finds that Doe's combined evidence (numerous procedural irregularities and indication that gender may have influenced the panel decision) is sufficient to raise a plausible inference that TCU's decision was a result of his sex.")

## V. CONTESTED ISSUES AND APPLICABLE LAW

### A. Significance of Procedural Irregularities

Plaintiff contends that procedural irregularities constitute evidence of sex discrimination, especially when those procedural irregularities all favor a female complainant over a male respondent, as the Fifth Circuit explicitly held in *Doe v. Rice Univ.*, 67 F.4th 702 (5th Cir. 2023).

Defendant maintains that procedural irregularities cannot count as evidence of sex discrimination. *See* Defendant's Motion for Summary Judgment, Doc. 42, at 15.

### B. Evidence of Gender Bias

Plaintiff asserts that—among other things—the female investigator's differential treatment of testimony from male and female witnesses; her decision to suppress evidence that a key female witness made biased statements about men; and her violation of the Title IX regulations designed to prevent sex discrimination in disciplinary proceedings all constitute precisely the type of evidence that suggests gender bias affected the outcome of the proceeding. *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (decisionmaker trusting female witnesses over male witnesses with similar characteristics supports inference of sex discrimination); *Doe v. Tex. Christian Univ.*, 601 F. Supp. 3d 78, 88 (N.D. Tex. 2022) (deviation from Title IX regulations supports inference of sex discrimination); *Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 897 (N.D. Iowa July 20,

2022) (fact that "certain exculpatory evidence was not considered during the investigation, nor included in materials for the [disciplinary panel's] review" was among the "clear procedural irregularities from which a reasonable jury could infer gender bias"); *Doe v. Wash. & Lee Univ.*, 2021 U.S. Dist. LEXIS 74222, *41 (W.D. Va. April 17, 2021) ("starkly different treatment" of key testimony from male and female witness supports inference of sex discrimination).

Plaintiff further asserts that PVAMU's gender bias is evident in the fact that while he was charged with numerous conduct and Title IX violations stemming from the events of February 3-4, 2021, female students who engaged in behavior which—by the university's own admission—violated university conduct policies were never investigated or

Defendant contends that Plaintiff has not produced evidence that its decision to expel Plaintiff was motivated by gender bias.

## C. Legal Standard

Plaintiff maintains that this court is bound by the "motivating factor" standard of causation adopted by the Fifth Circuit in *Doe v. Rice University*, which holds that Title IX "bars the imposition of university discipline where gender is a motivating factor in the decision." *Doe v. Rice Univ.*, 67 F.4th 702, 709 (5th Cir. 2023) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Defendant asks this court to defy the Fifth Circuit and instead follow the "but for" causation

standard adopted two years earlier by the Fourth Circuit in *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230 (4th Cir. 2021).

## VI. CONCLUSION

Plaintiff respectfully submits this Memorandum in support of the substantive and evidentiary issues of law that may arise in this case.

Dated: December 31, 2023

        ALLEN HARRIS PLLC

        */s/ Samantha K. Harris*
        Samantha K. Harris
        *Attorney-in-Charge*
        *Admitted pro hac vice*
        PA Bar No. 90268
        PO Box 673
        Narberth, PA 19072
        (610) 634-8258
        sharris@allenharrislaw.com

        THE SOTO LAW OFFICE, LLC

        */s/ Ramón A. Soto*
        Ramón A. Soto
        *Local counsel – not appearing at trial*
        S.D. Tex. Bar No. 24118927
        300 Central Ave. SW
        Suite 2500W
        Albuquerque, NM 87102
        (505) 273-4062
        ramon@sotolawoffice.co

        **ATTORNEYS FOR PLAINTIFF**